UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLEN OWENS,

    Plaintiff,

v.

MEIJER, INC.,

    Defendant.

Case No. 24-cv-10732
Hon. Matthew F. Leitman

_____/

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 38)

Plaintiff Allen Owens, an African American man, worked as a grocery stocking clerk for Defendant Meijer Great Lakes Limited Partnership[1] ("Meijer") for about nine months in 2022. During that time, Owens and his supervisors had typical workplace conflicts. Owens thought he should be promoted; his supervisors disagreed. His supervisors thought he was not completing his assigned tasks and had a bad attitude; Owens disagreed. The conflicts led to Owens' suspension in June of 2022. When the suspension ended, Owens did not return to work, and Meijer then

---

[1] Meijer says that it is incorrectly identified as "Meijer, Inc." in the case caption. (*See* Mot. for Sanctions, ECF No. 30, PageID.366.) The Court therefore **DIRECTS** the Clerk of the Court to amend the case caption to identify the Defendant in this action as "Meijer Great Lakes Limited Partnership."

terminated his employment on the ground that his failure to return amounted to a violation of its attendance policy.

In this action, Owens alleges that Meijer violated both federal and state law when it discriminated against him based on his race, retaliated against him, and created a hostile work environment based upon his race. But Owens lacks sufficient evidence that Meijer took any action against him based upon his race. And he has failed to present sufficient evidence that anyone at Meijer retaliated against him for engaging in conduct that is protected under the anti-discrimination laws that he invokes. Finally, he has not shown that he was subjected to a hostile work environment based upon his race. For these reasons and the others explained in detail below, the Court will **GRANT** the motion for summary judgment that Meijer has filed. (*See* Mot. for Summ. J., ECF No. 38.)[2]

## I

## A

Meijer is a regional grocery chain with stores across Michigan. In January 2022, Meijer hired Owens to work as a nighttime food stocker at its Northville, Michigan store. (*See* Owens Dep. at 22-23, ECF No. 38-2, PageID.576.) Owens' job duties included stocking the store's refrigerators on the overnight shift. (*See id.*

---

[2] The Court concludes that it may resolve Meijer's motion without a hearing. *See* E.D. Mich. Local Rule 7.1(f)(2).

at 23.)  This involved moving pallets of cold food from the back storage area to the sales floor of the store, and then stocking the food items in the refrigerators for sale. (*See id.* at 26-27, PageID.577.)  Meijer initially paid Owens $15.50 per hour, plus a shift premium for overnight work. (*See id.* at 24, PageID.576.)

Owens regularly worked with three other employees – Evander, Mohammed, and Leslie – all of whom were Black. (*See id.* at 80, PageID.590.)  He was supervised by two managers, Alan Chandler and Mike Leslie.[3] (*See id.* at 31-37, 59, PageID.578-579, 585.)

**B**

On May 31, 2022, Owens had what he regarded as an unsatisfactory exchange with Chandler.  The exchange began when Owens asked Chandler if Meijer was going to promote him (Owens) to stock manager. (*See id.* at 30-31, PageID.578.) Owens asked that question because, according to Owens, when Meijer hired him, the plan was for him to be elevated to the stock manager position after a period of time. (*See id.* at 28, PageID.577.)  Chandler responded that he did not believe Owens was ready for management, and he said that Owens had "a hard time taking direction." (*Id.* at 31-32.)

---

[3] The parties agree that during the relevant time period, Chandler's title was Stocking Team Leader and Leslie's title was Product Flow Line Leader. (*See* Mot. for Summ. J., ECF No. 38, PageID.544-545; Resp., ECF No. 41, PageID.646-647.)

The next day, June 1, 2022, Owens arrived for his shift and found another crew member pulling refrigerator pallets and putting them in a different place from where the night crew normally put them. (*See id.* at 35-36, PageID.579.)  When Chandler arrived, he asked Owens why the pallets were in a different spot.  Owens responded that he "ha[d] no idea" and that he was "just here to break them down." (*Id.* at 36.)

Later that night, Chandler and Leslie approached Owens. (*See id.* at 36-37.) Leslie asked Owens what was going on and said that Owens did not seem to be "working like [he's] supposed to." (*Id.* at 37.)  Owens recalls Leslie saying, "we think you have an attitude, because you're not the manager," and "we might need to send you home." (*Id.*)  Owens asked for a union representative. (*See id.* at 38, PageID.580.)   Leslie told Owens that he was not allowed to have union representation during the conversation, but Leslie did allow Owens to have a co-worker witness the interaction. (*See id.*)  After some additional heated conversation between Owens, Chandler, and Leslie, Owens was sent home. (*See id.* at 40.)

Meijer thereafter issued Owens a written warning for his behavior on May 31 and June 1 based on a write-up that Leslie had submitted. (*See* Written Warning, ECF No. 38-3, PageID.619.)  In the write-up, Leslie said:

> Beginning on the morning 5/31/2022, Allen Owens, and Alan Chandler (TL) had a conversation [about] the recommendation of Allen Owens being considered for a TL position with Meijer, that resulted in Allen Owens

> expressing his frustration with leadership within the store and swearing at Alan Chandler. On the start of the shift of 6/1/2022, Allen Owens seemed irritated and was wasting company times, talking to other employees in different work areas and wandering around. I wanted to have a conversation with Allen to find out what he was in such a negative mood, and was not being as productive as he normally was. Allen was confrontational making comments like "You don't even understand the English language, and I will just have to educate you", and "You should like at my bank account, I make more than both of you and don't even need this job". I asked Allen if he was willing to calm down and go back to work to be productive multiple times, Allen kept saying he didn't understand and talking in circles.

(*Id.*)

Owens, in turn, filed a grievance about being sent home early and not being allowed to call a union representative. (*See* Owens Dep. at 43-44, ECF No. 38-2, PageID.581.)

## C

On June 2, 2022, Owens had another confrontation with Leslie. During Owens' shift that day, Leslie approached Owens and told him that an ice cream pallet had been left unrefrigerated in an aisle. (*See id.* at 44.) Owens and Leslie got into an argument over whether it was Owens' responsibility to put the pallet back in a refrigerator. (*See id.* at 44-45.) Leslie again told Owens that he "d[idn't] like [Owens'] attitude." (*Id.* at 45.) Owens responded that he felt like he was "being singled out." (*Id.*) While Owens eventually returned the ice cream pallet to a

refrigerator, Leslie again asked Owens to leave work early. (*See id.*)  Owens pushed

back and said they should call a union representative. (*See id.*)  At that point, Leslie

threatened to call the police if Owens did not leave the store. (*See id.*)  Owens, who

had had previously had negative interactions with the police, decided it was best to

call the police himself. (*See id*. at 45-46, PageID.581-582.)  The police arrived and

offered to give Owens a ride home. (*See id.* at 46, PageID.582.)  Owens filed a

grievance against Leslie based upon this incident. (*See id.*)

### D

On June 4, 2022, Owens and Chandler had another disagreement.  During

Owens' shift that night, Chandler told Owens that he would send some additional

staff to help Owens with the pallets. (*See id.* at 66, PageID.587.)  Owens says that

he replied, "okay, as long as you send us some good help." (*Id.*)  Owens says that

Chandler responded by telling him (Owens) that he (Chandler) was "[expletive] tired

of [Owens] telling [him] what to do" and that Owens needed to go home. (*Id.*)

Owens left and later filed a third grievance. (*See id.* at 66-67.)

### E

Around the same time that Owens was having the above-described conflicts

with Chandler and Leslie, Owens inquired about possible Juneteenth observances at

6

Meijer.[4] (*See id.* at 67.)  He asked whether there was a "call off" list for absences and whether employees – who had been issued Meijer shirts as part of their uniform (*see id.* at 26, PageID.577) – were permitted to wear Juneteenth shirts. (*See id.* at 67, PageID.587.)  Owens thought it would be appropriate to wear a Juneteenth shirt because Meijer allows team members to wear celebratory attire on other holidays like St. Patrick's Day and for certain sporting events like Detroit Lions' football games. (*See id.* at 68-69.)

Leslie told Owens that he could not wear Juneteenth apparel to work. (*Id.* at 67.)  Owens then told Robert Hunter, another Meijer employee who was Owens' union representative, about his (Owens') desire to celebrate Juneteenth. (*See id.* at 68.)  Hunter said that he would "look into" the matter, and he raised the issue with Candice Lopez, the Store Human Resources Representative. (*See id.* at 68, 168-169, PageID.587, 612.)  Lopez also declined to permit Owens to wear Juneteenth apparel to work. (*See id.* at 109, PageID.597.)  Owens eventually concluded that Meijer had a "policy" of not allowing its employees to observe Juneteenth on the job. (*Id.* at 101, 109, PageID.595, 597.)

---

[4] Juneteenth – named a federal holiday by President Biden in 2021 – commemorates the emancipation of enslaved people during the U.S. Civil War. *See Our American Story – Juneteenth*, Nat'l Museum of Afr. Am. Hist. & Culture, https://nmaahc.si.edu/explore/stories/our-american-story-juneteenth, https://perma.cc/5SEY-TDLP (last visited June 10, 2026).

On June 10, 2022, Owens filed a grievance in which he complained that he was not permitted to wear Juneteenth apparel to work. (*See id.* at 67, PageID.587.)

**F**

A few weeks after Owens filed the Juneteenth-based grievance, he had another unpleasant interaction with Leslie.  On June 30, 2022, at about 5:00 a.m., Leslie "approached" Owens while Owens was working, and Leslie asked if Owens had "clock[ed] out" during his (Owens') break. (*Id.* at 50-51, PageID.583.)  Owens responded that he had not done so. (*See id.* at 51.)  Leslie admonished Owens and said that he was "supposed to clock out for [his] breaks." (*Id.*)  Owens disagreed that that was Meijer's practice. (*See id.*)  Leslie then left the area and printed off the rule about clocking out for breaks. (*See id.*)  Leslie returned with the rule and "follow[ed]" Owens between aisles while continuing to discuss the rule. (*Id.* at 52.) Leslie then "approache[d] right up to [Owens'] ear" and said "I don't even know why you are still working here, why you're trying so hard, you'll never be a store manager." (*Id.*)  Leslie then threatened to have Owens' truck towed. (*See id.*)  Owens responded to Leslie's conduct by asking Leslie if Leslie was "going to harass [him] all night." (*Id.* at 53.)

**G**

Later in the morning on June 30, a meeting was held at the Meijer store to discuss the above-described grievances that Owens had filed. (*See id.* at 53,

8

PageID.583.) The meeting was attended by Store Director Lavinel Puja, Store Human Resources Representative Candice Lopez, Union Steward Brandice Willett-Turner, Leslie, and Owens. (*See id.* at 58-59, PageID.585.)

The meeting "started off heated" when Puja complained that he was having trouble understanding the substance of Owens' grievances. (*Id.* at 60.) Owens was ultimately "asked to tell [his] side of the story," but he was "abruptly stopped and told that [he] was not allowed to question if Mike Leslie lied on his write up or not." (*Id.* at 61.) Owens was then "told [by Puja] that [he] was being out of line" and "being disrespectful again." (*Id.*) The meeting attendees then took a break. (*See id.* at 61-62, PageID.585-586.) Following the break, Owens accused Leslie of lying and insisted that he had a right "to speak against managers in a meeting." (*Id.* at 62, PageID.586.) Owens told Puja that if he (Owens) could not "speak openly" about Leslie's alleged lies, "then this meeting is over." (*Id.*) At the end of the meeting, Puja decided to suspend Owens pending an investigation into his conduct. (*See id.*)

During Owens' suspension, he had a conversation with Meijer Human Resources Market Manager Charlotte Crowley about being moved to a different department upon return from his suspension. (*See id.* at 78, PageID.590.) During that conversation, he also told Crowley that he felt Leslie and Chandler were "harassing" him and that the incidents "were discrimination." (*Id.* at 79.)

**H**

9

Meijer agreed to end Owens' suspension in August of 2022. (*See id.* at 83-84, PageID.591.) At that time, Meijer Human Resources Representative Candice Lopez attempted to give Owens a schedule for returning to work. (*See id.*) But Owens told her that it was not "appropriate" for him to return to work under Leslie and Chandler. (*See id.* at 84-85.) He said that Crowley had indicated that he would be allowed to change departments upon his return. (*See id.*) Lopez responded that Owens would not be permitted to change departments, and she told Owens to "let [her] know when [he could] come back to work." (*Id.* at 85.) Owens replied that he could "come back to work when we figure out if I'm going to be changing departments." (*Id.*) He added that he could not return for at least two weeks because he had obtained employment at Taco Bell during his suspension, and he needed to give Taco Bell notice that he would need to adjust his hours at Taco Bell. (*See id.*)

At the end of September, Hunter (who, as noted above, was one of Owens' union representatives) emailed Owens "to see why [he] had not returned to work." (*Id.* at 89, PageID.592.) Owens responded that he had not returned because he did not think was "appropriate for [him] to go to work under Allen Chandler." (*Id.* at 89-90, PageID.592-593.)

Hunter reached out to Owens again at the beginning of October to follow up on why Owens had not returned to work. (*See id.* at 90, PageID.593.) Hunter gave Owens a date to show up for work. (*See id.* at 90-91.) Owens did report for work

that day, but he told Chandler when he arrived that he was managing some family emergencies and that he needed to go home. (*See id.*)  Chandler allowed him to return home. (*See id.*)

Owens says that after that, "all communication broke down," and he never talked to the union or anyone at Meijer about how long he would need to be off from work. (*Id.* at 91, 94, PageID.593, 594.)  He did not return to work during the rest of October, and on October 27, 2022, Meijer terminated his employment pursuant to the terms of its attendance policy because he "failed to return to work as scheduled." (Meijer's Supplemented Responses to Plaintiff's First Set of Interrogatories, ECF No. 28-1, PageID.340.)

## II

On March 21, 2024, Owens brought this action against Meijer. (*See* Compl., ECF No. 1.)  In total, he asserts seven claims against Meijer.  First, he claims that Meijer discriminated against him on the basis of his race in violation of three statutes: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"); and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* (the "ELCRA"). (*See id.*, PageID.8-9, 13-14.)  Next, he claims that Meijer retaliated against him in violation of those same three statutes. (*See id.*, PageID.10-13.)   Finally, he claims that Meijer

unlawfully created a racially hostile work environment in violation of the ELCRA. (*See id.*, PageID.15-16.)

On October 22, 2025, Meijer filed its current motion for summary judgment. (*See* Mot. for Summ. J., ECF No. 38.)  Owens filed a response (ECF No. 41), and Meijer filed a reply (ECF No. 48). The Court has carefully reviewed the briefs and is now prepared to rule on the motion.

### III

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326–27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

IV

A

The Court begins with Owens' race discrimination claims under Title VII, Section 1981, and the ELCRA. These federal and state claims are reviewed under the same standard. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (noting in case where plaintiff brought discrimination claims under Title VII, the ELCRA, and Section 1981 that "[a]ll of [plaintiff's] discrimination claims are subject to the same burden-shifting standard"); *Noble v. Brinker Int'l Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) ("The elements of a *prima facie* case as well as the allocations of the burden of proof are the same for employment claims stemming from Title VII and § 1981.") (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th Cir. 2000)).

A plaintiff may prove a discrimination claim under these laws either by direct or indirect evidence. *See Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). Where a plaintiff relies on indirect evidence, as Owens does here, the Court must apply the burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See id.* Under this framework, Owens "must first establish a *prima facie* case of discrimination by a preponderance of the evidence." *Id.* This requires him "to demonstrate that he 1) 'is a member of a protected class;' 2) 'was qualified for his job;' 3) 'suffered an adverse

13

employment decision;' and 4) 'was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees.'" *Id.* at 606–07 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). The "burden of establishing a *prima facie* case is not an onerous one." *Id.* at 606 (citation omitted).

If Owens satisfies his burden at the *prima facie* stage, then "the burden shifts to [Meijer] 'to articulate some legitimate, nondiscriminatory reason for' the adverse employment action. Should [Meijer] do so, [Owens] then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination." *Id.* at 607. (citations omitted) (cleaned up). Owens "can create a triable issue of fact over whether [his] discipline was pretextual if [he] establishes, by a preponderance of the evidence, one of three things: '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [his] discharge, or (3) that they were insufficient to motivate discharge.'" *Meadows v. Delta Air Lines, Inc.*, No. 25-1346, 2026 WL 242884, at *5 (6th Cir. Jan. 29, 2026) (quoting *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)).

**B**

Although Owens' burden at the *prima facie* stage is not heavy, his race discrimination claims fail at that stage. The claims arise out of three separate adverse actions: (1) Meijer sending Owens home early from work early three times in June

14

2022; (2) Meijer suspending Owens in late June 2022; and (3) Meijer terminating Owens' employment in October 2022. (*See* Mot. for Summ. J., ECF No. 38, PageID.554-558; Resp., ECF No. 41, PageID.655.)  Owens has failed to establish a *prima facie* case of discrimination with respect to any of those actions because he has not even attempted to show that he was replaced by, and/or treated differently than, similarly situated employees outside of his protected class under similar circumstances.  Thus, his claims do not survive the *prima facie* stage.

## C

Owens offers three counterarguments.  None of those arguments persuades the Court that he may proceed with his race discrimination claims.

## 1

Owens first argues that "Discovery Obstruction" by Meijer prevented him from obtaining information about comparator employees that he could have used to satisfy his burden at the *prima facie* stage, and he therefore contends that the Court should not grant summary judgment based upon his inability to identify such employees. The Court disagrees.  As explained below, Owens waived any argument he may have had concerning the alleged obstruction by Meijer.  And in any event, Meijer did not obstruct his ability to conduct discovery.

A bit of procedural history shows that Owens has waived any challenge to Meijer's alleged failure to make required discovery concerning comparator

15

employees.  Shortly after discovery commenced, Owens served on Meijer a set of interrogatories and document requests in which Owens sought, among other things, the identities of employees who had been terminated, as he was, for violating Meijer's attendance policy. (*See* Meijer's Supplemented Responses to Plaintiff's First Set of Interrogatories, ECF No. 28-1, PageID.345-346.)  Owens' requests were quite broad.  He demanded that Meijer identify (1) "all individuals terminated, including asked to resign, by Defendant in the past five years, and provide the reason for the employee's departure;" (2) "all individuals who violated Defendant's attendance policy between 2022-2023" and to provide the date, time, nature, and disciplinary action associated with each violation; and (3) "all individuals, by name and position, who were terminated for violation of Defendant's attendance policy between 2022-2023." (*Id.*)  Those requests covered employees who worked in different roles, different departments, different stores, different states, and reported to different supervisors. (*See id.*)  Meijer objected to the requests on overbreadth grounds – on the basis that Meijer employed "over one hundred thousand individuals in over 100 different locations" in Michigan alone, and many of the employees whose identities Owens sought were not similarly situated to Owens. (*Id.*)  But Meijer did identify the employees who worked at the same Meijer store as Owens who had been terminated for violating the attendance policy. (*See id.*, PageID.342-343.)  Meijer served its response and objections on Owens on July 25, 2024.  At that

16

time, Owens did not file a motion to compel Meijer to supplement its responses or produce additional documents.

Nearly one year later, on June 25, 2025, Owens did file such a motion to compel. (*See* Mot. to Compel, ECF No. 28.)  By that time, fact discovery had closed. (*See* Am. Case Mgmt. Reqs. & Sched. Order, ECF No. 11.)  The Court referred the motion to compel to the assigned Magistrate Judge.  The Magistrate Judge denied the motion because it was untimely. (*See* Order, ECF No. 40.)  He explained that even though Owens "had months to file a timely motion to compel" before the close of discovery, Owens had offered "no explanation" for his failure to do so. (*Id.*, PageID.637.)  The Magistrate Judge therefore concluded that Owens had not "act[ed] with due diligence to file a timely motion to compel." (*Id.*, PageID.638.)[5] Owens did not file any objections to the order denying the motion to compel.

---

[5] Owens' lead attorney should have been well aware of the danger of filing a discovery-related motion after the close of discovery because she had filed such motions in the past and had them denied. *See, e.g.*, *Williams v. AK Steel Dearborn Works*, No. 17-cv-11394, 2019 WL 117333, at *1 (E.D. Mich. Jan. 17, 2019) (noting that Owens' lead counsel failed to act with reasonable diligence where she filed a motion to re-open discovery several months after the close of discovery); *Askew v. George Matick Chevrolet*, No. 16-cv-13148, 2019 WL 2714771, at *1 (E.D. Mich. Feb. 4, 2019) (denying motion to compel discovery filed by Owens' lead counsel "[b]ecause," among other things, "the motion was filed after discovery was closed"); *Bivens v. Zep, Inc.*, 147 F.4th 635, 651 (6th Cir. 2025) (noting that district court denied a motion to compel that Owens' lead counsel "filed after the close of discovery" and declining to review the denial because counsel did not properly present the issue on appeal).

Because Owens did not file objections to that order, he has waived any right to further review of the order and waived any arguments that he may have had about the insufficiency of Meijer's responses to his discovery requests. *See* Fed. R. Civ. P. 72(a) ("A party may not assign as error a defect in the order not timely objected to."). And given that waiver, he may not rely on Meijer's allegedly-deficient discovery responses as a basis for denying Meijer's motion for summary judgment.

In any event, Meijer's discovery responses were not insufficient. Meijer properly identified the universe of employees who could arguably be comparators to Owens – those who worked at the same store. *See Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (explaining that plaintiffs must show comparators were "similarly situated in all of the relevant respects," which generally includes whether comparators "dealt with the same supervisor" and "were subject to the same standards" as the plaintiff) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (cleaned up). Likewise, Owens' request for the identities of all Meijer employees who were terminated under the attendance policy was far too broad given that Meijer is a very large company with thousands of employees who work in substantially different positions and circumstances.

For all of these reasons, the Court rejects Owens' contention that it should deny summary judgment on the race discrimination claims on the ground that Meijer "obstructed" discovery.

**2**

Owens next argues that he was "not required to identify a similarly situated comparator to survive summary judgment." (Resp., ECF No. 41, PageID.655.)  He insists that "[t]he Sixth Circuit has repeatedly held that circumstantial evidence alone can establish discriminatory intent and create an inference of discrimination sufficient to withstand summary judgment." (*Id.*)

But Owens does not cite a single decision that so holds.  "And it is not the Court's responsibility to search for that authority" for him. *Heron Cove Ass'n v. Midland Cnty. Bd. of Comm'rs*, No. 24-cv-11458, 2025 WL 873023, at *8 (E.D. Mich. Mar. 20, 2025).[6]  Moreover, it would be unfair to Meijer to permit Owens to pursue this line of argument that relies upon uncited authority.  Owens' failure to identify the line of cases on which he relies has deprived Meijer of the opportunity to address and attempt to distinguish those cases.  For these reasons, the Court declines to entertain Owens' argument that he has satisfied his burden at the *prima facie* stage even though he has not identified any similarly situated comparators.

---

[6] *See also Total Renal Care, Inc. v. Childers Oil Co.*, 743 F.Supp.2d 609, 619 (E.D. Ky. 2010) (Thapar, J.) ("It is not the Court's responsibility to troll through the annals of Kentucky law in search of legal authority that the parties have not provided."); *Rajapakse v. Internet Escrow Servs.*, No. 21-cv-158, 2022 WL 4084417, at *4 (E.D. Tenn. Sept. 6, 2022) ("It is not the Court's responsibility to search through caselaw to find support for Defendant's arguments."); *Brooks v. Mentor Worldwide, LLC*, 985 F.3d 1272, 1280 (10th Cir. 2021) (explaining that court is "under no obligation to search out … authorities that [Plaintiffs] have not presented for [themselves]") (internal quotation marks and citation omitted).

In any event, even if the Court were to consider Owens' contention that he presented sufficient circumstantial evidence of discrimination to satisfy his p*rima facie* burden, the Court would reject it.  Owens says that the following evidence is circumstantial proof that he was the victim of race discrimination:

> The fourth element—differential treatment—is established through multiple circumstances: subjective accusations of being "disrespectful," having a "poor attitude," or being "unproductive" (Crowley Decl. Ex. 1), all of which are highly susceptible to bias (*Mitchell*, 964 F.2d at 584); a pattern of escalating discipline immediately following Plaintiff's legitimate promotion inquiry on May 31, 2022 (Owens Dep. at 31:2-10, 32:18-20) including three instances of being sent home, a written warning, and suspension within one month; differential treatment in assignments, with Leslie and Chandler only speaking to Plaintiff to relay instructions [to other Black employees] or send him home (Owens Dep. at 81:18-25, 111:23-112:4, 82:6-83:11); and disparate treatment regarding Juneteenth, where Plaintiff was prohibited from recognizing a historically Black holiday while other employees were allowed to celebrate other holidays (Owens Dep. at 67:24-68:3, 68:16-69:6).

(Resp., ECF No. 41, PageID.655-656.)  The Court disagrees.

First, while Owens cites the Sixth Circuit's decision in *Mitchell v. Toledo Hospital*, 964 F.2d 577, 584 (6th Cir. 1992), for the proposition that an employer's use of terms like "disrespectful" and "poor attitude" are "highly susceptible to bias" (Resp., ECF No. 41, PageID.656), the Sixth Circuit in *Mitchell* did not say that.  And Owens has not linked his supervisors' use of those terms to his race.  Notably, the other members of Owens' team with whom he "typically" worked most closely were

20

Black (*see* Owens Dep. at 34, 80, ECF No. 38-2, PageID.579, 590), and Owens has not cited any evidence indicating that the supervisors labeled these other employees as "disrespectful" or as having a "poor attitude." Indeed, Owens has not cited any evidence that his supervisors had any conflicts of any kind with any of his Black colleagues. The absence of such evidence undercuts Owens' suggestion that the supervisors' interactions with him had anything to do with his race.

Second, the fact that the supervisors disciplined Owens, standing alone, is not evidence of race discrimination. Indeed, that is precisely why a *prima facie* case of race discrimination must include a showing that the plaintiff was treated differently than employees outside of his protected class with respect to the discipline.

Third, while Owens says that his supervisors only spoke to him when directing him to relay instructions to other Black employees, that fact, even if accepted as true, is not evidence that any of the adverse actions had anything to do with Owens' race. As noted above, all of the other employees with whom Owens regularly worked were Black, and there is nothing unusual or suspicious about the supervisors telling Owens to deliver direction to those workers.

Finally, the Juneteenth circumstances do not support an inference that Owens was suspended or terminated based upon his race. According to Owens, Meijer had a company-wide "policy" that prohibited him from observing Juneteenth (*see id.* at 101, 109, PageID.595, 597), and that broad policy says nothing about whether the

21

particular decisions by his supervisors to suspend him and terminate his employment were tied to his race.

For all of these reasons, if Owens had properly presented his argument that he has established a *prima facie* case of race discrimination through circumstantial evidence (which he did not), the Court would find that his evidence falls short.  And because Owens has failed to satisfy his *prima facie* burden, his race discrimination claims fail as a matter of law.[7]

---

[7] The Court pauses to explain why it did not discuss above, and will not consider, certain circumstantial evidence of discrimination that Owens did not mention in his deposition testimony and which he belatedly cited in a Declaration that he filed with the Court. (*See* Owens Decl., ECF No. 42.)  The Court declines to consider this evidence pursuant to the well-established rule that a plaintiff may not create a factual dispute by submitting evidence that contradicts his deposition testimony. *See Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  For instance, in his Declaration, Owens says that he was "referred to as 'Ricky' from the movie Boyz n the Hood," by a Meijer employee named Lysa. (Owens Decl., ECF No. 42, PageID.673.)  He says that he found that "racially offensive because Ricky was a popular Black male athlete who was killed in the movie." (*Id.*)  But during his deposition, he was asked to identify "anyone" who "discriminated against [him] at Meijer," and he did not mention Lysa or say anything about being called Ricky. (Owens Dep. at 102, ECF No. 38-2, PageID.596.)  Additionally, Owens says in his Declaration that he saw "store leadership," including "managers" (plural), were "friendlier and more conversational with some white employees." (Owens Decl., ECF No. 42, PageID.670.)  He added that the managers "greet[ed]," "chat[ted] with," and "interact[ed] in a friendly way" with a white employee "named Amanda," but did not do the same with him. (*Id.*)  But during his deposition, he identified only one store leader, Lavinel Puja, the Store Director, as having friendly interactions with Amanda and other white employees. (*See* Owens Dep. at 105-106, ECF No. 38-2, PageID.596-597.)  He said nothing about Chandler and Leslie doing the same even though he was asked to identify all of their discriminatory conduct. (*See id.* at 104, PageID.596.)  Thus, he may not support his claim that Chandler and Leslie – the primary alleged bad actors at Meijer (*see id.* at 101, PageID.596) – discriminated

22

**3**

Finally, Owens argues that there is at least a question of fact as to whether he was "actually 'disrespectful' or 'loud and disruptive'" at the grievance meeting that led to his suspension. (Resp., ECF No. 41, PageID.650.)  Owens says this factual dispute precludes summary judgment on his race discrimination claims.  The Court again disagrees.

While there may be a factual dispute as to whether Owens was actually disrespectful or disruptive, that dispute does not preclude summary judgment on the basis that Owens failed to satisfy his obligation at the *prima facie* stage to submit evidence that supports an inference of race discrimination.  Instead, the type of factual dispute identified by Owens – that relates to whether an employer's stated reason for an adverse action is true – becomes relevant when and if a court reaches the pretext stage of the analysis. *See Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009) (explaining that at the pretext stage of the *McDonnell Douglas* test, a district court evaluates whether the defendant's "proffered reasons [for the adverse action] had no basis in fact").  And a court does not reach the pretext stage unless and until a plaintiff satisfies his burden to present evidence supporting an inference

against him based upon his race with the contention in his Declaration that managers were solicitous of white employees but not of him.  In short, Owens may not save his claims by citing these details that appear for the first time in his Declaration because they cannot reasonably be squared with his deposition testimony.

23

of discrimination at the *prima facie* stage. *See id.* Since Owens has failed to do that (for the reasons explained above), he cannot avoid summary judgment by identifying a possible dispute of fact that may exist at the pretext stage of the analysis.

## D

For all of these reasons, Meijer is entitled to summary judgment with respect to Owens' race discrimination claims under Title VII, Section 1981, and the ELCRA.

## V

## A

Next, the Court turns to Owens' retaliation claims. As with Owens' discrimination claims, his retaliation claims under Title VII, Section 1981, and the ELCRA are all governed by the same framework. *See Kuhn*, 709 F.3d at 627 ("[T]he ELCRA analysis [for retaliation claims] is identical to the Title VII analysis.") (quoting *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir.2012)); *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019) ("The elements of a retaliation claim under § 1981 are the same as those under Title VII."). In order to survive summary judgment on these claims, Owens must present either direct evidence of retaliation or sufficient indirect evidence of retaliation to satisfy the *McDonnell Douglas* framework. *See Redlin*, 921 F.3d at 613 (applying the *McDonnell Douglas* framework to plaintiff's Title VII and ELCRA retaliation claims).

24

Owens relies on indirect evidence.  "Under the [indirect evidence] approach," Owens "must first establish a *prima facie* case of retaliation by demonstrating" the following four elements:

> (1) [the plaintiff] engaged in activity protected by Title VII; (2) [the plaintiff's] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Id.* (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  If Owens "succeeds in making out the elements of a *prima facie* case of retaliation, the burden of production shifts to [Meijer] to articulate a legitimate, non-retaliatory reason for the termination." *Redlin*, 921 F.3d at 613 (quoting *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017) (cleaned up)).  "If [Meijer] satisfies its burden of production [by proffering a legitimate reason for his termination], the burden shifts back to [Owens] to show that the reason was a pretext for retaliation." *Id.* at 614.  Owens "can show pretext in three interrelated ways: (1) that the proffered reason[ ] had no basis in fact, (2) that the proffered reason[ ] did not actually motivate the employer's action, or (3) that [the proffered reason was] insufficient to motivate the employer's action." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350–51 (6th Cir. 2021).

25

**B**

The Court first addresses whether Owens has carried his burden at the *prima facie* stage to show that he engaged in protected conduct.  "Protected conduct refers to action taken to protest or oppose statutorily prohibited discrimination." *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015).  Such conduct "includes the filing of formal charges of discrimination as well as informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Id.* (cleaned up). *See also Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (explaining that Title VII's retaliation provisions protect opposition to "discriminatory employment practices").  Owens says that he engaged in four instances of protected conduct.  The Court considers each instance individually.  The Court concludes that three of the four instances identified by Owens do not rise to the level of protected conduct, and the Court assumes without deciding that the fourth instance does.

First, Owens says that he engaged in protected conduct when he "filed grievances about being sent home without cause and being denied union representation." (Resp., ECF No. 41, PageID.658.)  But the filing of those grievances is not protected conduct because the grievances did not "oppose statutorily

26

prohibited discrimination." *Planadeball*, 793 F.3d at 175.  Owens counters that the grievances amounted to protected conduct under the Sixth Circuit's decision in *Johnson v. University of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000), which, he says, stands for the proposition that "[a] grievance challenging unfair treatment in the workplace is protected opposition." (Resp., ECF No. 41, PageID.658.)  But *Johnson* does not so hold.  On the contrary, at the page of the *Johnson* decision Owens cites, the Sixth Circuit held that a plaintiff engaged in protected conduct where he opposed racial discrimination that occurred in a hiring process. *See Johnson*, 215 F.3d at 579–80.

Second, Owens contends that he engaged in protected conduct when, on June 30, 2022, he asked Leslie if Leslie was "going to harass [him] all night." (Resp., ECF No. 41, PageID.659.)  But the context in which Owens asked that question shows that the question was not protected conduct.  Owens queried Leslie about harassment in direct response to Leslie "follow[ing]" him around and "ma[king] comments such as 'I don't even know why you're still working here' and 'you'll never be a store manager.'" (*Id.*)  And Owens has not presented any evidence that Leslie's harassing conduct was based upon his (Owens') race, nor did Owens connect the harassment to his race in any way when he confronted Leslie about it.  Simply put, Owens did not engage in protected conduct by opposing harassment by Leslie that was not connected to Owens' race.

Third, Owens argues that he engaged in protected conduct when, during the June 30, 2022, meeting concerning his grievances, he "challenged management's account of events and accused Leslie of lying about" their previous interactions. (*Id.*) But that challenge was not a challenge to racial discrimination, and thus it does not rise to the level of protected conduct.

Finally, Owens says that he engaged in protected conduct when he "expressly complained of discrimination to HR Market Manager Charlotte Crowley in late July 2022." (*Id.*)  Owens stresses that he "told Crowley that Leslie and Chandler were discriminating against him based on how they treated him since June 1, that their behavior was 'directed toward me and not others,' and that he was being 'singled out.'" (*Id.*)  These statements by Owens present the closest question with respect protected activity.  On one hand, the statements look like protected conduct because they refer to discrimination and differential treatment.  On the other hand, there is some evidence in the record that perhaps suggests that the statements did not relate to race-based discrimination and thus did not rise to the level of protected conduct.  More specifically, Owens appeared to suggest during at least some of his deposition testimony that the discrimination he faced was being treated differently than his closest co-workers (*see* Owens Dep. at 45, 79-80, ECF No. 38-2, PageID.581, 590) – all of whom were Black – and that type of discrimination would not appear to be race-based.  Because the question strikes the Court as a close one, and because it is

28

not necessary for the Court to decide the question (for the reasons explained below), the Court will assume without deciding that Owens' statements to Crowley in July of 2022 constituted protected conduct. And the Court will proceed to analyze whether Owens has made out a *prima facie* case of retaliation based upon his statements to Crowley in July of 2022.

## C

Owens has not made a *prima facie* showing of retaliation with respect to his statements to Crowley because he has not shown a causal connection between his statements to Crowley and his termination (which was the only adverse action that occurred after his statements to Crowley). Owens attempts to show that causal connection through temporal proximity – by stressing that he was terminated roughly two and one-half months after making the statements. (*See* Resp., ECF No. 41, PageID.660.) "But a roughly 75-day delay between [his] protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (holding that plaintiff did not establish a *prima facie* case of Title VII retaliation).

Owens insists that his evidence of temporal proximity does not stand alone and that that evidence, when combined with other circumstantial evidence, supports a finding that there was a causal connection between his complaint about discrimination and his termination. The Court disagrees.

29

Owens has failed to show how the other evidence establishes the required causal connection. For instance, he contends "that a series of adverse actions following protected activity can establish causation" (Resp., ECF No. 41, PageID.660), but here, there was no "series of adverse actions" following Owens' complaint of discrimination to Crowley. His termination was the sole adverse action that followed that complaint. Owens further contends that the Court may infer a causal connection between his complaint of discrimination and his termination based, in part, on the fact that after he complained to Crowley, Meijer "[a]greed to reinstate him but set conditions." (*Id.*) However, he has not identified any "conditions" that Meijer placed upon his reinstatement. Meijer simply required him to return to his original position. Next, he argues that the Court may infer a causal connection between his complaint about discrimination and his termination, in part, on the basis that "[a]fter [he] complained about discrimination," Meijer "kept him suspended." (*Id.*) But the suspension was imposed *before* he complained about discrimination, and the fact that it remained in place after the complaint says little, if anything, about whether there is causal connection between his complaint and his termination.

Simply put, Owens has failed to identify any evidence that meaningfully establishes a causal connection between his complaint of discrimination and his termination from employment. Owens has therefore failed to establish a *prima facie*

30

case of retaliation with respect to the one instance of protected conduct in which he engaged.

### D

For all of these reasons, Meijer is entitled to summary judgment on Owens' retaliation claims.

### VI

Next, the Court turns to Owens' claim under the ELCRA that he was subjected to a hostile work environment.  In order to establish a hostile work environment claim

> under Title VII or the ELCRA, a plaintiff must demonstrate that (1) [she] belongs to a protected class; (2) [she] was subject to unwelcome harassment; (3) the harassment was based on [a protected category]; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known about the harassment and failed to take action.

*Khalaf v. Ford Motor Co.*, 973 F.3d 469, 472 (6th Cir. 2020) (cleaned up) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017)).  "When evaluating these claims . . . [courts] look[] at the totality of the alleged harassment to determine whether it was sufficiently severe or pervasive to alter the conditions of a plaintiff's employment and create an abusive working environment." *Id.* (cleaned up). The Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Id.* (quoting

31

*Phillips*, 854 F.3d at 328). "For example, in the context of alleged racial discrimination, [the Sixth Circuit] has determined that 'even offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements.'" *Id.* (quoting *Phillips*, 854 F.3d at 328).

In addition, the Sixth Circuit has emphasized that the third element of the hostile work environment claim "limits the scope of the analysis: only harassment *based on the plaintiff's race* may be considered." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (emphasis in original).  Courts should therefore "first determine what harassment was based on [a plaintiff's] race, then [] ask whether the totality of that harassment was sufficiently severe or pervasive to create a jury question on her claim." *Id.*

Owens has failed to meet this "high bar" here with respect to his hostile work environment claim.  First, Owens has failed to show that he experienced harassment that was so "severe or pervasive" as to alter "the conditions of [his] employment." *Khalaf*, 973 F.3d at 472.  Second, for all of the reasons explained in Section IV, *supra*, Owens has failed to show that he was harassed *based upon his race*.  For these reasons, Meijer is entitled to summary judgment on Owens' hostile work environment claim.

32

## VII

The Court finally turns to Owens' request under Federal Rule of Civil Procedure 56(d) to permit him to conduct additional discovery before it rules on Meijer's motion for summary judgment.  Owens included this request in a Declaration filed by one of his attorneys. (*See* Thurman Decl., ECF No. 46, PageID.678.)  There, Owens' attorney offers three reasons for why Owens should be allowed to take additional discovery.  None persuade the Court to grant additional discovery.

## A

First, Owens' attorney contends that Owens should be permitted to depose Meijer employee Charlotte Crowley because Owens was surprised that Meijer submitted Crowley's declaration in support of its motion for summary judgment.  In that declaration, Crowley provided details concerning Meijer's termination of Owens.  Owens' attorney says that Owens never had a fair opportunity to cross-examine Crowley concerning her contentions.  The Court disagrees.  As Owens admits, Meijer identified Crowley in "earlier discovery responses" as "someone expected to know about Meijer's employment practices, policies and procedures, and [Owens'] employment and grievances." (*Id.* at ¶ 5, PageID.679. *See also* Meijer's Supplemented Responses to Plaintiff's First Set of Interrogatories, ECF No. 28-1, PageID.339.)  Moreover, Crowley was at the center of several key events

33

described by Owens in his own testimony (*see, e.g.*, Owens Dep. at 78-79, 84-85, ECF No. 38-2, PageID.590, 591), and that is a further reason that Owens should not have been surprised by her status as a witness.  Owens could have – and should have – deposed Crowley during discovery; he chose not to do so.   Under these circumstances, the Court declines to re-open discovery to permit Owens to depose Crowley now.   Moreover, there is no basis to re-open discovery based upon Crowley's declaration because the Court's decision to grant summary judgment in favor of Meijer does not rest upon any of the statements in that declaration.

**B**

Second, Owens' attorney says that the Court should permit Owens to take additional discovery because Meijer produced an unprepared witness for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), and Owens' attorney says that the witness was unable to provide certain essential information that was required pursuant to the terms of the deposition notice. (*See* Thurman Decl. at ¶¶ 10-17, PageID.680-682.)

The Court is not persuaded to grant Owens' request for additional discovery on this ground for two reasons.  First, Owens did not provide the Court with the Rule 30(b)(6) deposition notice he served on Meijer, and without the notice, the Court is not able to assess whether, as Owens' counsel insists, Meijer's witness was actually unable to provide information on topics that were sufficiently identified in the

34

deposition notice. *Cf. Bivens v. Zep*, 147 F.4th 635, 651–52 (6th Cir. 2025) (declining to review plaintiff's claim that district court's reasons for denying motion to compel was an abuse of discretion because plaintiff had failed to order transcript of hearing in which district court provided its reasoning).  Second, if and to the extent that Meijer's witness was not properly prepared to answer deposition questions, Owens had a readily available remedy.  He could have filed a motion to compel Meijer to prepare and produce an additional 30(b)(6) witness – and could even have sought reimbursement for the fees incurred in preparing for and conducting the additional deposition. *See, e.g.*, *Western Express, Inc. v. Cathey*, No. 24-02139, 2025 WL 2098598, at *4–5 (W.D. Tenn., July 25, 2025) (compelling party who failed to prepare a 30(b)(6) witness to prepare and present a second 30(b)(6) witness for a deposition and compelling party to pay opposing party's fees and costs in connection with second deposition).  Having failed to avail himself of that available remedy, he is not now entitled to conduct discovery into the issues identified in his 30(b)(6) notice.

## C

Finally, Owens' attorney argues that the Court should allow Owens to conduct discovery into potential comparator employees on whom he could rely in support of his discrimination claim.  Owens' attorney says that Owens is entitled to that discovery because Meijer obstructed Owens' efforts to obtain the information during

35

the discovery period.   However, as described at length above, this issue was the subject of Owens' June 2025 Motion to Compel, which the Magistrate Judge denied because it was untimely and because Owens had not diligently pursued the discovery. (*See* Order, ECF No. 40.)  For the reasons explained in Section IV(C)(1), *supra* – including because Owens did not object to the Magistrate Judge's decision – the Court declines to allow additional discovery into comparator employees based upon Owens' accusation that Meijer obstructed discovery into that topic.

## VIII

For all of the reasons explained above, Meijer's motion for summary judgment (ECF No. 38) is **GRANTED**.  All of Owens' claims are **DISMISSED**.

**IT IS SO ORDERED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 24, 2026

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 24, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126

36